IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ALLEN SCHEFFER;<br>PATRICIA SCHEFFER,<br><br>                Plaintiffs,<br><br>v.<br><br>ALBEMARLE COUNTY;<br>RANDY JAMERSON, in his individual capacity,<br><br>                Defendants. | Case No. 3:23-cv-00048<br><br>**Jury Trial Demanded** |

## COMPLAINT

NOW COMES Plaintiffs Allen Scheffer ("Mr. Scheffer") and Patricia Scheffer ("Mrs. Scheffer") (collectively, "Plaintiffs"), by counsel, demanding a jury trial and alleging the following against Defendants Albemarle County ("Defendant Albemarle County"), and Randy Jamerson ("Defendant Jamerson") in his individual capacity, who is Special Operations Division Commander at Albemarle County Police (collectively, "Defendants"):

### INTRODUCTION

Plaintiffs' constitutional and state rights were violated when, in the early morning of August 7, 2022, Defendant Albemarle County and Defendant Jamerson—in concert with Charlottesville Police Department and its officers—unconstitutionally seized and searched Plaintiffs in the course of a self-admitted "wild goose chase." Plaintiffs now bring this action for compensatory damages, reasonable attorney fees, and punitive damages pursuant to 42 USC §§ 1983 and 1988, the Fourth Amendment, Fourteenth Amendment, and Virginia state law.

1

## PARTIES

1. Plaintiffs are individuals who currently reside in Illinois.

2. Defendant Albemarle County is a municipal corporation organized under Title 15.2 of the Code of Virginia. It maintains and operates the Albemarle County Police Department ("ACPD"). Defendant Albemarle County is responsible for the appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including but not limited to Defendant Randy Jamerson.

3. Defendant Randy Jamerson is the Special Operations Division Commander for the Albemarle County Police Department in Albemarle County, Virginia. At all times relevant herein Defendant Jamerson was employed by Defendant Albemarle County, and acted as a supervisor for Defendant Albemarle County.

4. At all times relevant hereto, Defendants Albemarle County and Jamerson were acting under color of state law.

5. Defendant Jamerson's acts alleged herein were committed within the scope of his employment, under the authority of the ACPD, while he was performing tasks specifically authorized and ratified by ACPD, or in the alternative, while he was acting on his own accord.

6. Defendants are sued based on a theory of direct liability, and/or a theory of vicarious liability where applicable.

## JURISDICTION

7. This action arises under the United States Constitution, particularly under the provisions of the Fourth Amendment and the Fourteenth Amendment to the Constitution of the United States, and under federal law, particularly the Civil Rights Act of 1871, 42 U.S.C. § 1983, as amended.

8. This court has subject-matter jurisdiction under 42 U.S.C. §§ 1983; 28 U.S.C. § 1331, 1343; and the Fourth Amendment and Fourteenth Amendment, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's state law claims.

9. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to this action occurred in the Western District of Virginia, specifically in Charlottesville, Virginia.

## FACTS

10. In August of 2022 Plaintiffs traveled from their home in Illinois to Charlottesville, Virginia for leisure in order to hike and explore Shenandoah National Park as part of a trip to celebrate their 30th wedding anniversary. Mr. and Mrs. Scheffer are a Certified Public Accountant and High School Teacher, respectively.

11. Plaintiffs checked in to the Hotel in Charlottesville, Virginia, on August 5, 2022, and were staying at the Hotel on August 7, 2022.

12. It would turn out that Plaintiffs' decision to stay at the Hotel would lead to the most traumatic event of their lives.

13. At this same time, on August 7, 2022, Charlottesville Police Department ("CPD") Sergeant Lisa Best received a phone message from ACPD Sergeant John Doe[1] instructing Best to call Doe.[2]

14. Doe told Best that ACPD was working with Amhurst County Police Department to locate a male suspect who ACPD believed abducted a woman in Florida.

---

[1]   Doe is identified only as "AP202" in Charlottesville Police Department's Police Report.
[2]   A majority of the information in this Complaint describing the actions of other parties that do not involve Plaintiffs originate from CPD's Police Report drafted by Best and provided to Plaintiffs.

3

15. Doe told Best that ACPD had tracked the suspect's phone, and the phone was pinging a cell tower in the area of 1705 Emmet St N, in Charlottesville, Virginia, but that the phone had also been pinging in the "Pantops area" approximately 5 miles away.

16. Thus, Doe, ACPD, and Best only knew that this individual may be located somewhere in the Charlottesville, Virginia area.

17. Doe asked Best for CPD's assistance in locating the suspect.

18. Doe provided Best with the suspect's name,[3] and advised that the suspect may be driving a "black Jeep with tinted windows," and that there might be some "damage" on the front of the vehicle. The model of Jeep was not specified.

19. Of course, it is common knowledge that Jeep sells some of the most popular and common cars in the United States, that black is one of the most popular car colors, and that there are many Jeep models.

20. Doe told Best that ACPD's Special Weapons and Tactics Team ("SWAT") was on standby, and asked Best to alert Doe and ACPD if the vehicle was located, and not to approach the vehicle.

21. Doe then provided Best with a photo of the suspect.

22. Best then instructed CPD officers to check various areas around Charlottesville to attempt to locate the suspect.

23. At approximately 1:00 a.m. CPD Officer Curry told Best that Curry simply found a black Jeep with Florida tags in the parking lot of the Hotel.

24. The black Jeep did not have tinted windows, and there was no damage to the front of the vehicle.

---

[3] While Defendants and relevant police officers in this Complaint knew the suspect's name at the time of the events in this Complaint, the name is not yet known to Plaintiffs.

25. Curry ran the Jeep's tag and he discovered that the car belonged to the Hertz rental car company. Neither Curry nor Best were ever told that the suspect they were looking for was driving a rental vehicle.

26. Best asked Curry to go speak with the clerk at the Hotel and show the photograph of the suspect to the hotel clerk.

27. Best wrote in her police report that Curry showed the photo to the clerk and the clerk stated that he believed he saw the suspect come in the hotel around midnight, just hours before, to check in. Best also wrote in her police report that Curry clarified that the individual the hotel clerk was referencing did not have a woman with him when he checked in just hours before.

28. Best notified Defendant ACPD, and Defendant ACPD began activation of the SWAT team and Defendant Jamerson.

29. Crucially, Curry continued to speak with the hotel clerk to attempt to verify that the man the hotel clerk saw check in hours before was in fact the suspect, and during this time CPD Officer Alfonso began working with Hertz to obtain information on the identity of the individual(s) who rented the Jeep.

30. Best and the other officers waited for approximately 45 minutes, at which point the hotel clerk was still unable to locate video of the man the hotel clerk claimed may have been the suspect that checked in hours before, and the hotel clerk was still unable to find a name in the registrar that matched the suspect's name.

31. Best was updating Defendant ACPD with all of this lack of information and lack of verification.

32. Eventually, and crucially, Hertz confirmed for Best that the common black Jeep in the hotel parking lot was unsurprisingly not a Jeep that belonged to the suspect, but rather was rented out of Northern Virginia and rented to Mr. Scheffer.

33. The hotel clerk then verified to the various officers that Mr. Scheffer checked into the hotel days prior, thus eliminating Mr. Scheffer and the black Jeep as the Jeep of the suspect, and eliminating Mr. Scheffer and the black Jeep as the person and car driven by the individual the hotel clerk believed may have been the suspect.

34. Further, Plaintiffs' booked the hotel room almost two months prior, which also was a fact alone that eliminated them as suspects. No law enforcement inquired from the hotel clerk when Mr. Scheffer booked his hotel room.

35. Thus, Best, Defendant ACPD, Defendant Jamerson, and CPD all received confirmation that: (1) the black Jeep in the parking lot of the hotel, which did not have tinted windows or front damage, did not belong to the suspect, (2) that the black Jeep belonged to Mr. Allen Scheffer, (3) that Mr. Scheffer had checked in days prior, and (4) that Mr. Scheffer was not the person the hotel clerk was referring to as the potential suspect who checked in hours before.

36. Further, Best, Defendant ACPD, Defendant Jamerson, and CPD could not obtain any information from the hotel clerk at this point, whether via video or name registration, that the suspect had ever even been to the hotel.

37. Confoundingly, Best stated in her police report that based on all of this information, Mr. Scheffer was "probably not the suspect," despite there being no evidence at all that Mr. Scheffer was the suspect, and there being affirmative evidence that ruled out Mr. Scheffer and his common black Jeep as the suspect.

38. Best stated in her police report that despite believing Mr. Scheffer was not the suspect, she wanted to knock on his door—room 236—to have an allegedly consensual conversation with him. This statement was false. Indeed, it was actually Defendant Jamerson's idea to go to Plaintiffs' room.

39. Best and Defendant Jamerson learned that Plaintiffs were staying in room 236 because the hotel clerk told them, despite the fact that the hotel clerk was not permitted to give this private information to anyone based upon the circumstances present.

40. Crucially, before going to knock on Plaintiffs' door, the various officers, including Best and Defendant Jamerson, finally were able to view footage of the man that the hotel clerk claimed he thought might be the suspect. Best admitted in her police report that it was "very obvious that the man in the video was not the suspect." Best updated Defendant ACPD and Defendant Jamerson on this information.

41. Best stated in her police report that the hotel clerk stated that the man in this video who was very "obvious[ly] not the suspect" was Mr. Scheffer in room 236. Officer Curry stated that the hotel clerk claimed the man he believed was the suspect was a different guest than Mr. Scheffer.

42. Thus, at this time, Best, CPD, Defendant ACPD, and Defendant Jamerson possessed the following information: (1) a man named Allen Scheffer rented a common black Jeep from Hertz rental car in Northern Virginia days before; (2) Mr. Scheffer had been staying at the hotel for multiple days; (3) the black Jeep did not match the description of the suspect's vehicle, as it did not have tinted windows and did not have damage to the front end; (4) Mr. Scheffer was staying in room 236 and was not the suspect the police were looking for; and (5) the hotel clerk's statement that the suspect may have been at the hotel at some point was now completely irrelevant, as it was determined to be "obvious" that the person who the hotel clerk identified as the potential suspect was not the suspect.

43. Despite all of this information, which demonstrated to Best, CPD, Defendant ACPD, and Defendant Jamerson that Mr. Scheffer was certainly the renter of the black Jeep who was staying in room 236 and was "obviously" not the suspect, Best, CPD officers, and ACPD officers, along with ACPD's SWAT team and Defendant Jamerson, still decided to go to room 236 and eventually seize

7

Mr. Scheffer. Further, the officers, including Defendant Jamerson, took a hotel key for Plaintiffs' room, demonstrating their intent to seize Plaintiffs.

44. The hotel clerk did not bother to call Plaintiffs' hotel room number to alert them that armed police officers were going to be knocking on their door at 3:00 a.m. for no legitimate reason.

45. Best and other officers, including ACPD SWAT Officers and Defendant Jamerson, went to Plaintiffs' hotel room door at approximately 3:00 in the morning and began banging on Plaintiffs' door.

46. All of these individuals began banging on Plaintiffs' door not knowing what Mr. Scheffer or Mrs. Scheffer even looked like. Indeed, no law enforcement officer made any effort to ask the hotel clerk to pull video footage of Plaintiffs' checking in to the hotel, or their activities on hotel property, despite doing this investigation for the individual the hotel clerk stated was potentially the suspect.

47. Mr. Scheffer was then startled awake to the sound of banging on the front door of their hotel.

48. Mr. Scheffer assumed that the pounding of the door was a drunk guest who had the wrong room, so Plaintiffs ignored the banging.

49. Approximately one minute passed, and Mr. Scheffer heard the banging on their front door again.

50. After hearing the banging continue, Mr. Scheffer decided to investigate what was going on.

51. Mr. Scheffer grabbed a flashlight on the nightstand next to Plaintiffs' bed, and opened the bedroom door of his suite, which opened into the living room area of Plaintiffs' suite.

52. Mr. Scheffer then walked to the front door of Plaintiffs' suite where the banging was occurring.

53. Mr. Scheffer then looked through the eyehole of the front door, and saw Best.

54. Best was standing on the other side of the door with Defendant Jamerson.

55. When Mr. Scheffer looked through the eyehole to see Best, Best called out to him on the other side of the door: "Mr. Scheffer?"

56. Mr. Scheffer responded in the affirmative, wondering what was going on.

57. Best admits that Mr. Scheffer identified himself through the door as Mr. Scheffer.

58. According to Best's police report, she inferred, absurdly, that it was strange Mr. Scheffer seemed hesitant to answer the strangers banging on his hotel door at 3 o'clock in the morning.

59. Best, with Defendant Jamerson standing next to her, yelled to Mr. Scheffer that he "was not in trouble," but that they needed to talk to him about his vehicle outside.

60. Best asked Mr. Scheffer if he would open the door and speak with them.

61. Mr. Scheffer assumed that his rental vehicle must have been damaged in the parking lot, and so he opened the door.

62. As Mr. Scheffer opened the door he saw Defendant Jamerson's and Best's gun pointed directly at himself. Best yelled and instructed Mr. Scheffer to show his hands.

63. Mr. Scheffer, holding his flashlight, crouched down and placed the flashlight on the floor, and then raised his hands.

64. Best then yelled and ordered Mr. Scheffer to step outside, and Plaintiff Allen Scheffer followed orders and walked toward Best and Defendant Jamerson with their guns pointed at him.

65. Mr. Scheffer and Mrs. Scheffer were seized during this time and not permitted to leave.

66. As Mr. Scheffer approached, Defendant Jamerson grabbed Mr. Scheffer's left arm and led Mr. Scheffer to a wall in the hallway where he conducted a search of Mr. Scheffer, and looked for weapons on Mr. Scheffer.

67. During this time multiple other members of Defendant ACPD's SWAT team were stationed at the end of the hall on both sides at the stairwells.

68. At this time Best and Defendant Jamerson then seized Mrs. Scheffer and Mrs. Scheffer was ordered into the hallway.

69. During the seizure, Best and Defendant Jamerson viewed portions of the inside of Plaintiffs' hotel room without consent, violating their reasonable expectation of privacy, and also partially trespassed into their hotel room, both of which constitute a search.

70. Best, Defendant Jamerson, and the remaining officers eventually confirmed again, as they already knew before knocking on his door, that Mr. Scheffer was not the suspect they were looking for, and released him and Mrs. Scheffer.

71. Defendant Jamerson later described the seizure of Plaintiffs as a "wild goose chase."

72. Neither Defendant Jamerson nor Defendant ACPD ever filed a police report or weapons report for the incident.

## INJURIES AND DAMAGES

73. This action seeks damages on behalf of Plaintiffs for the loss of liberty, invasion of privacy, and emotional pain, trauma, and suffering as a consequence of the actions described above.

74. The acts of all Defendants entitle Plaintiffs to compensatory and punitive damages, as well as reasonable attorney's fees.

## COUNT I
### Denial of Federal Rights Under Color of State Law, 42 U.S.C. § 1983, in Violation of the Fourth Amendment Against Defendants—Unconstitutional Search Against Defendants

75. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above and below paragraphs with the same force and effect as if fully set forth herein.

76. Defendant Jamerson conducted a search when he viewed the contents of Plaintiffs' hotel room without consent pursuant to an unconstitutional seizure, and searched Mr. Scheffer's body.

77. Defendant Jamerson did not have probable cause or a warrant to conduct a search.

78. Defendant Jamerson was a supervisor and employee for Defendant Albemarle County.

79. Defendant Jamerson's actions and statements, as a supervisor for Defendant Albemarle County, the acts of Defendant Albemarle County in response to the events that took place, and the acts of ACPD's SWAT team**,** demonstrate that Defendant Albemarle County has failed to adequately train its officers and/or sanctions the conduct of Defendant Jamerson.

## COUNT II
### Denial of Federal Rights Under Color of State Law, 42 U.S.C. § 1983, in Violation of the Fourth Amendment Against Defendants—Unconstitutional Seizure Against Defendants

80. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above and below paragraphs with the same force and effect as if fully set forth herein.

81. Defendant Jamerson conducted a seizure of Plaintiffs when he pointed his gun at Plaintiffs, grabbed Mr. Scheffer's left arm and led Mr. Scheffer to a wall in the hallway where he conducted a search of Mr. Scheffer, and looked for weapons on Mr. Scheffer, and ordered Mrs. Scheffer into the hallway.

82. Defendant Jamerson did not have probable cause or a warrant to conduct a seizure.

83. Defendant Jamerson was a supervisor and employee for Defendant Albemarle County.

84. Defendant Jamerson's actions and statements, as a supervisor for Defendant Albemarle County, the acts of Defendant Albemarle County in response to the events that took place, and the acts of ACPD's SWAT team**,** demonstrate that Defendant Albemarle County has failed to adequately train its officers and/or sanctions the conduct of Defendant Jamerson.

## COUNT III
### Intentional Infliction of Emotional Distress Against Defendants

85. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above and below paragraphs with the same force and effect as if fully set forth herein.

86. Virginia case law has established four elements for an intentional infliction of emotional distress claim without physical injury. One, the wrongdoer's conduct was intentional or reckless. This element is satisfied when the wrongdoer intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations wherein only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was sever

87. Defendant Jamerson intended his specific conduct of pointing his gun at Plaintiffs and unconstitutionally searching and seizing them, and he should have known that emotional distress would likely result from this action.

88. These acts above were outrageous and intolerable in that it offends against the generally accepted standards of decency and morality, and is not merely bad manners or mere hurt feelings involved.

89. Defendant Jamerson's conduct directly caused Plaintiffs' emotional distress.

90. The emotional distress Plaintiffs have suffered is severe.

91. Defendant Jamerson was a supervisor and employee for Defendant Albemarle County.

92. Defendant Jamerson's actions and statements, as a supervisor for Defendant Albemarle County, the acts of Defendant Albemarle County in response to the events that took place, and the acts of ACPD's SWAT team**,** demonstrate that Defendant Albemarle County has failed to adequately train its officers and/or sanctions the conduct of Defendant Jamerson.

## COUNT IV
### Assault Against Defendants

93. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above and below paragraphs with the same force and effect as if fully set forth herein.

94. Common law tortious assault is "an overt act intended to place the victim in fear or apprehension of bodily harm," which did in fact create "such reasonable fear or apprehension in the victim." *Id. Blankenship v. Commonwealth*, 71 Va. App. 608, 620-21, 838 S.E.2d 568, 574 (2020). The bodily harm threatened need not be serious or deadly harm.

95. Defendant Jamerson's actions of, among other things, pointing his weapon at Plaintiffs without any legal justification was an overt act intended to place Plaintiffs in fear or apprehension of bodily harm, which did in fact create such reasonable fear or apprehension in Plaintiffs.

96. Defendant Jamerson was a supervisor and employee for Defendant Albemarle County.

97. Defendant Jamerson's actions and statements, as a supervisor for Defendant Albemarle County, the acts of Defendant Albemarle County in response to the events that took place, and the acts of ACPD's SWAT team, demonstrate that Defendant Albemarle County has failed to adequately train its officers and/or sanctions the conduct of Defendant Jamerson.

## COUNT V
### Negligence Against Defendants

98. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above and below paragraphs with the same force and effect as if fully set forth herein.

99. The law recognizes three degrees of negligence, (1) ordinary or simple, (2) gross, and (3) willful, wanton, and reckless. Ordinary or simple negligence is the failure to use 'that degree of care which an ordinarily prudent person would exercise under the same or similar circumstances to avoid injury

to another." *Perlin v. Chappell*, 198 Va. 861, 864, 96 S.E.2d 805, 808 (1957) (*quoting Montgomery Ward and Co. v. Young*, 195 Va. 671, 673, 79 S.E.2d 858, 859 (1954)).

100. Defendant Jamerson's actions was a deviation from the acceptable degree of care when, among other things, Defendant Jamerson searched and seized Plaintiffs and pointed his weapon at Plaintiffs without any legal justification.

101. Defendant Jamerson was a supervisor and employee for Defendant Albemarle County.

102. Defendant Jamerson's actions and statements, as a supervisor for Defendant Albemarle County, the acts of Defendant Albemarle County in response to the events that took place, and the acts of ACPD's SWAT team, demonstrate that Defendant Albemarle County has failed to adequately train its officers and/or sanctions the conduct of Defendant Jamerson.

## COUNT VI
## Gross Negligence Against Defendants

103. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above and below paragraphs with the same force and effect as if fully set forth herein.

104. Gross negligence is "that degree of negligence which shows indifference to others as constitutes an utter disregard of prudence amounting to a complete neglect of the safety of [another]." *Ferguson v. Ferguson*, 212 Va. 86, 92, 181 S.E.2d 648, 653 (1971) (emphasis omitted). It is a degree of negligence as would shock fair minded men although something less than willful recklessness.

105. Defendant Jamerson's actions showed a complete neglect of the safety of Plaintiffs, when, among other things, Defendant Jamerson searched and seized Plaintiffs and pointed his weapon at Plaintiffs without any legal justification.

106. Defendant Jamerson was a supervisor and employee for Defendant Albemarle County.

107. Defendant Jamerson's actions and statements, as a supervisor for Defendant Albemarle County, the acts of Defendant Albemarle County in response to the events that took place, and the acts of

ACPD's SWAT team**,** demonstrate that Defendant Albemarle County has failed to adequately train its officers and/or sanctions the conduct of Defendant Jamerson.

## COUNT VII
### Willful and Wanton Negligence Against Defendants

108. Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in the above and below paragraphs with the same force and effect as if fully set forth herein.

109. Willful and wanton negligence is acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another. *Friedman v. Jordan*, 166 Va. 65, 68,  (1936).

110. Defendant Jamerson acted consciously in disregard of Plaintiff's rights to be free from unconstitutional searches and seizures, or acted with reckless indifference to the consequences, when, among other things, Defendant Jamerson searched and seized Plaintiffs and pointed his weapon at Plaintiffs without any legal justification.

111. Defendant Jamerson was aware, from his knowledge of existing circumstances and conditions, that the conduct probably would cause injury to Plaintiffs.

112. Defendant Jamerson was a supervisor and employee for Defendant Albemarle County.

113. Defendant Jamerson's actions and statements, as a supervisor for Defendant Albemarle County, the acts of Defendant Albemarle County in response to the events that took place, and the acts of ACPD's SWAT team**,** demonstrate that Defendant Albemarle County has failed to adequately train its officers and/or sanctions the conduct of Defendant Jamerson.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests the Court enter judgment for her and order relief as follows:

A. Compensatory damages against Defendants, jointly and severally;

B.  Punitive damages against Defendant Jamerson;

C.  Reasonable attorney's fees and costs pursuant to 28 USC § 1988 against Defendants, jointly and severally; and

D.  That the Court grant any other and further relief it deems equitable and just

Respectfully submitted, the 21st day of September, 2023.

/s/ Blake A. Weiner
Blake A. Weiner, VA Bar No. 94087
BLAKE WEINER LAW, PLLC
1806 Summit Avenue, Suite 300
Richmond, VA 23230
Telephone: (804) 482-1465
Email: bweiner@blakeweinerlaw.com
*Counsel for Plaintiffs*