CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
June 12, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
      DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ALLEN SCHEFFER, *et al.*, | CASE NO. 3:23-cv-00048 |
| *Plaintiffs*, | |
| v. | MEMORANDUM OPINION AND ORDER |
| ALBEMARLE COUNTY, *et al.*, | |
| *Defendants*. | JUDGE NORMAN K. MOON |

This case comes to the Court on Defendant Albemarle County's (hereinafter "the County") motion to dismiss for failure to state a claim.[1] Plaintiffs Allen and Patricia Scheffer (collectively "Plaintiffs") have brought two 42 U.S.C. § 1983 claims against the County.[2] Specifically, Plaintiffs contend that they suffered at least two constitutional injuries pursuant to a policy or custom of the County. For the following reasons, the Court concludes that Plaintiffs have failed to state a claim as to the County, and as a result, the Court will grant Defendant Albemarle County's motion to dismiss.

## BACKGROUND

In August of 2022, Plaintiffs Allen and Patricia Scheffer traveled to Charlottesville, Virginia to celebrate their 30th wedding anniversary. Dkt. 26 ¶ 10. Important here, during the trip, they rented a black jeep, *id.* ¶ 32, and stayed at a hotel in Charlotteville, *id.* ¶ 11.

---

[1] The Court will take up Randy Jamerson's motion to dismiss (Dkt. 15) in a separate opinion.

[2] In their original Complaint, Plaintiffs asserted multiple state law claims against the County. *See* Dkt. 1. However, Plaintiffs have since abandoned those claims. *Compare id. with* Dkt. 10 *and* Dkt. 26. Accordingly, the Court will dismiss Plaintiffs' state law claims against the County.

1

While Plaintiffs were visiting Charlottesville, law enforcement was conducting a manhunt. In particular, the Albemarle County Police Department ("ACPD") asked the Charlottesville Police Department ("CPD") to help apprehend an individual who was believed to have abducted a woman in Florida. *Id.* ¶¶ 14, 17. ACPD informed CPD that they "had tracked the suspect's phone, and the phone was pinging" two cell towers in Charlottesville. *Id.* ¶¶ 15–16. ACPD provided CPD with a picture of the suspect, told CPD "the suspect's name, and advised that the suspect may be driving a black Jeep with tinted windows" and "some damage on the front of the vehicle." *Id.* ¶¶ 18, 21. Finally, ACPD instructed CPD to "alert ACPD if the vehicle was located, and not to approach the vehicle." *Id.* ¶ 20. ACPD's Special Weapons and Tactics Team ("SWAT") was placed on standby. *Id.*

During law enforcement's search for the suspect, a CPD officer reported that he had "found a black Jeep with Florida tags in the parking lot of" a hotel.[3] *Id.* ¶ 23. Notably, this Jeep was not an exact match to the suspect's vehicle. The Jeep *did not* "have tinted windows [or] damage to the front of the vehicle." *Id.* ¶ 24. Furthermore, when the officer "ran the Jeep's tag[,] he discovered that the car belonged to the Hertz rental car company." *Id.* ¶ 25.

Nevertheless, the CPD officer entered the hotel and showed a photograph of the suspect to the hotel clerk. Significantly, the "clerk stated that he believed he saw the suspect come in the hotel around midnight, just hours before, to check in." *Id.* ¶¶ 26–27. As a result, CPD "notified Defendant ACPD, and Defendant ACPD began activation of the SWAT team and Defendant Jamerson"—the "Special Operations Division Commander for the Albemarle County Police Department." *Id.* ¶¶ 3, 28.

---

[3] Unbeknownst to the officer, the Jeep was Plaintiffs' rental car. *Id.* ¶ 32.

Before the ACPD SWAT team arrived at the hotel, CPD attempted to "verify that the man the hotel clerk saw check in hours before was in fact the suspect." *Id.* ¶ 29. To do so, CPD asked the hotel clerk to locate the video of the supposed suspect checking in, and at the same time, CPD contacted Hertz "to obtain information on the identity of the individual(s) who rented the Jeep." *Id.* ¶ 29. CPD's inquiries revealed that the suspect was likely not staying at the hotel. First, Hertz informed CPD that the Jeep "was rented out of Northern Virginia … to Mr. Scheffer." *Id.* ¶ 32. Then, shortly after, "the hotel clerk [ ] verified … that [Plaintiffs] checked into the hotel days prior." *Id.* ¶ 33. Further, law enforcement was eventually "able to view footage of the man the hotel clerk claimed he thought might be the suspect." *Id.* ¶ 40. And after viewing the footage, one officer apparently noted "that it was 'very obvious that the man in the video [—i.e., Mr. Scheffer—] was not the suspect.'" *Id.*

Nonetheless, "CPD officers, and ACPD officers, along with ACPD's SWAT team and Defendant Jamerson, still decided to go to [Plaintiffs'] room" to have "an allegedly consensual conversation with" Mr. Scheffer. *Id.* ¶¶ 38, 43. "All of these individuals began banging on Plaintiffs' door" in the middle of night. *Id.* ¶¶ 45–46. Startled awake by the banging, Mr. Scheffer initially ignored it, supposedly assuming that "the pounding of the door was a drunk guest who had the wrong room." *Id.* ¶¶ 47–48. However, when the banging continued, Mr. Scheffer walked to the front door of the hotel room "to investigate." *Id.* ¶¶ 49–52. He looked through the eyehole of the front door and saw a CPD officer on the other side. *Id.* ¶ 53. Wondering what was going on, Mr. Scheffer "identified himself through the door." *Id.* ¶¶ 56–57. He was then informed "that he 'was not in trouble,' but that they needed to talk to him about his vehicle outside." *Id.* ¶ 59. Assuming "that his rental vehicle must have been damaged in the parking lot, … he opened the door." *Id.* ¶ 61.

The scene that faced Mr. Scheffer was allegedly far from calm. Indeed, Mr. Scheffer supposedly saw "Defendant Jamerson's and [another officer's] gun[s] pointing directly at him[] within seconds of opening the door." *Id.* ¶ 62. Mr. Scheffer was instructed to "show his hands" and then "ordered … to step outside." *Id.* ¶¶ 62–64. He complied. And "[a]s Mr. Scheffer approached, Defendant Jamerson grabbed Mr. Scheffer's left arm and led Mr. Scheffer to a wall in the hallway where he conducted a search of Mr. Scheffer and looked for weapons on Mr. Scheffer." *Id.* ¶ 66. At the same time, Defendant Jamerson and another officer purportedly retrieved "Mrs. Scheffer and … ordered [her] in[to] the hallway." *Id.* ¶ 68. During Plaintiffs' encounter with law enforcement, "Defendant ACPD's SWAT team w[as] stationed at the end of the hall on both sides at the stairwells." *Id.* ¶ 67. Moreover, Plaintiffs allege that, during the encounter, "Defendant Jamerson [and another officer] viewed portions of the inside of Plaintiffs' hotel room without consent … and also partially trespassed into their hotel room." *Id.* ¶ 68.

At the culmination of the incident, "Defendant Jamerson, and the remaining officers … confirmed … that Mr. Scheffer was not the suspect they were looking for, and released him and Mrs. Scheffer." *Id.* ¶ 70. Supposedly, "Defendant Jamerson later described the [interaction with] Plaintiffs as a 'wild goose chase.'" *Id.* ¶ 71. "Neither Defendant Jamerson nor Defendant ACPD ever filed a police report or weapons report for the incident." *Id.* ¶ 72.

## STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all its allegations taken as true and all reasonable inferences drawn in the plaintiff's favor. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

4

A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (quotation marks omitted). This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics," instead the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (providing that "only a complaint that states a plausible claim for relief survives a motion to dismiss").

## ANALYSIS

42 U.S.C. § 1983 permits lawsuits against "person[s]" who, under color of state law, deprive another of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States. Relevant here, localities, unlike states, can be treated as "persons" subject to liability under Section 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). But this general rule is subject to an important limitation: "a [locality] cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* Rather, a local government, such as the County, is liable only when the entity itself is a "moving force" behind the deprivation. *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981).

To demonstrate that a locality was a moving force behind a constitutional injury, a "plaintiff must establish that the[ir constitutional] deprivation occurred *pursuant to a policy or*

5

*custom* adopted by the local governing body." *Monell*, 436 U.S. at 690 (emphasis added). Put differently, the entity's official policy or custom must have played a part in the alleged violation of federal law. *Oklahoma City v. Tuttle*, 471 U.S. 808, 817–18 (1985).

A policy or custom for which a local government may be held liable can arise in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (internal quotation marks omitted) (cleaned up).

Here, Plaintiffs put forward three theories of *Monell* liability. They claim that the County is subject to municipal liability (1) "under a failure to train theory," (2) "based on the decisions of a person with final policymaking authority," and (3) because "Defendant Albemarle 'sanctioned' [or ratified] the conduct of Defendant Jamerson and the SWAT officers when it provides that [the County] has allowed the incident to essentially be swept under the rug." Dkt. 19 at 9–12. None of Plaintiffs' theories are persuasive.

### I.     *Plaintiffs have not plausibly alleged a failure to train claim.*

"For [the County] to be liable under § 1983 for failing to properly train [ACPD's SWAT team], the failure to train must 'amount[ ] to deliberate indifference to the rights of persons with whom the police come into contact.'" *Est. of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Only with evidence of deliberate indifference "can … a shortcoming [in police training] be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton*, 489 U.S. at 389.

6

To properly plead deliberate indifference, a plaintiff must aver that local "policymakers [were] on actual or constructive notice that a particular omission in their training program causes [local] employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "Actual knowledge may be evidenced by recorded reports to or discussions by a [locality's] governing body," and "[c]onstructive knowledge may be evidenced by the fact that the [unlawful] practices have been so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of them." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987).

Moreover, the mere existence of "general laxness or ineffectiveness in training" is insufficient to support a failure to train claim. *Spell*, 824 F.2d at 1390. Rather, for liability to attach, a plaintiff must identify "a specific deficiency" with the locality's training program, *id.*, and that "identified deficiency … must be closely related to the ultimate injury" suffered by the plaintiff. *City of Canton*, 489 U.S. at 391.

Here, Plaintiffs do not plausibly allege a failure to train claim. They merely state that:

> Defendant Jamerson's actions and statements, as a supervisor for Defendant Albemarle County, the acts of Defendant Albemarle County in response to the events that took place, and the acts of ACPD's SWAT team, demonstrate that Defendant Albemarle County has failed to adequately train its officers and/or sanctions the conduct of Defendant Jamerson.

Dkt. 26 ¶¶ 79, 84. This allegation is deficient for multiple reasons. Not only is it wholly conclusory, but it also fails to identify a specific shortcoming in the County's training regimen or plausibly demonstrate that the County acted with "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. At bottom, Plaintiffs have not alleged any "facts revealing: (1) the nature of the [insufficient] training, (2) that the [insufficient] training was a 'deliberate or conscious' choice by the [the County], [or] (3) that the

7

officer's conduct resulted from said [insufficient] training." *Green v. Lilly*, No. 7:23-CV-151, 2023 WL 6564907, at * 7 (W.D. Va. Oct. 10, 2023) (citations omitted). Each of these deficiencies independently dooms Plaintiffs' failure to train claim.[4]

### II. *Plaintiffs have likewise failed to plausibly allege that Defendant Jamerson is an official with final policymaking authority and that the County is, thus, liable for his decisions.*

Plaintiffs next contend that "Defendant Jamerson, the Special Operations Division Commander, supervisor for Defendant Albemarle, and leader of Defendant Albemarle's SWAT team, is an official responsible for establishing final policy with respect to the subject matter in question—that is, the actions of the SWAT team during the subject matter of investigating a crime and attempting a search and seizure." Dkt. 19 at 11 (cleaned up). Their argument, however, misses the mark.

To be sure, "liability may be imposed [on a locality] for a single decision by [local] policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Specifically, "a single act by a [locality] may give rise to civil liability if it is shown that the officials of the [locality] responsible for establishing the challenged policy made a calculated choice to follow the course of action deemed unconstitutional." *Pachaly v. City of Lynchburg*, 897 F.2d 723, 726 (4th Cir. 1990). However, "in assessing whether a [locality] may be held liable for the constitutional or statutory violations of their decisionmakers, the touchstone

---

[4] Plaintiffs, for their part, contend that because Defendant Jamerson "is not a subordinate, but the Special Operations Division Commander and a Supervisor for Defendant Albemarle," this case is distinguishable from a normal failure to train case. Dkt. 19 at 9–10. Specifically, Plaintiffs posit that since "Defendant Jamerson [violated Plaintiffs' constitutional rights], along with the entire SWAT team for Defendant Albemarle," it is reasonable to conclude that the County "necessarily has failed to properly train not only its subordinates, but its supervisors." *Id.* at 10. Plaintiffs are incorrect. They have identified no cases which make the distinction they propose. And in any event, as discussed above, their failure to train claim fails on multiple other independent bases.

inquiry is whether 'the [relevant] decisionmaker possesses *final authority to establish [ ] policy with respect to the action ordered.*'" *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 554–55 (4th Cir. 2018) (emphasis added) (quoting *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016)).

"The question of who possesses final policymaking authority is one of state law." *Riddick v. Sch. Bd.*, 238 F.3d 518, 523 (4th Cir. 2000) (citing *Pembaur*, 475 U.S. at 483). In answering this question, courts "look to [ ] relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." *Id.* (internal quotation marks omitted) (quoting *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

Relevant here, the Fourth Circuit has distinguished between "the authority to make final *policy* [and] the authority to make final implementing *decisions*." *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 966 (4th Cir. 1995). Policymakers have the "authority to set and implement general goals and programs of [local] government," while those who possess the authority to make final implementing decisions have "discretionary authority in purely operational aspects of government." *Spell*, 824 F.2d at 1386. "It is the [locality's] policies, not '[a] subordinate's departures from them,' that must underlie [local] liability in such instances." *Crowley v. Prince George's Cnty., Md.*, 890 F.2d 683, 687 (4th Cir. 1989) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).

In the present case, Plaintiffs conflate the two concepts—a misstep which sinks their claim. They posit that Defendant Jamerson established the final policy governing "the actions of [ACPD's] SWAT team *during* the subject matter of investigating a crime and attempting a search and seizure." Dkt. 19 at 11 (emphasis added). That is, Plaintiffs surmise that Defendant Jamerson made a "deliberate choice to follow a[n unlawful] course of action" in interacting with

9

Plaintiffs. *Id.* at 12. But Defendant Jamerson's interaction with Plaintiffs has little to do with "set[ting] and implement[ing] general goals and programs of [local] government." *Spell*, 824 F.2d at 1386. Rather, Plaintiffs' allegation simply shows that Defendant Jamerson had "discretionary authority in purely operational aspects of government"—i.e., he was able to investigate criminal conduct in the manner he liked. *Id*. Put differently, Defendant Jamerson had the authority to make final *implementing* decisions, not final *policymaking* decisions.

At bottom, Plaintiffs' Complaint is devoid of allegations tending to show that Defendant Jamerson was a policymaker. Crucially, Plaintiffs do not identify any state law endowing Defendant Jamerson with policymaking authority, nor do they point to any custom or usage that would do so. *Riddick*, 238 F.3d at 523. Simply put, even with all its allegations taken as true and all reasonable inferences drawn in Plaintiffs' favor, Plaintiffs' Complaint does not plausibly allege that Defendant Jamerson is an official with final policymaking authority. It follows that the County cannot be held liable for his decisions. *Monell*, 436 U.S. at 690–91.

### III.     ***Finally, Plaintiffs have not plausibly alleged that the County ratified Defendant Jamerson's supposedly unlawful conduct.***

When a final policymaker "has the authority to review the decision of a subordinate, its *approval of that allegedly unconstitutional decision* can also give rise to liability under Section 1983." *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 534 (4th Cir. 2022) (emphasis added) (citing *Hall v. Marion Sch. Dist. No. 2*, 31 F.3d 183, 196 (4th Cir. 1994)). This is known as ratification liability, and it "critically differs from [*respondeat superior*] liability, … which is impermissible under *Monell* …, [because r]atification liability does not hold a [locality] liable for the actions of subordinate officials; rather it holds the [locality] liable for its own decision to uphold the actions of subordinates." *Starbuck*, 28 F.4th at 534 (emphasis in original) (citing *Jett*, 491 U.S. at 736).

10

Here, Plaintiffs have not sufficiently alleged that the County "approv[ed] of [Defendant Jamerson's] allegedly unconstitutional" actions. *Starbuck*, 28 F.4th at 534 (citation omitted). In their response brief, Plaintiffs cite *one* paragraph from their Complaint to support the proposition—raised only on brief—"that Defendant Albemarle 'sanctioned' the conduct of Defendant Jamerson and the SWAT officers when it … allowed the incident [with Plaintiffs] to essentially be swept under the rug." Dkt. 19 at 12 (citing paragraph 72 of Plaintiffs' Complaint). That's it. And that paragraph does not support Plaintiff's proposition. Rather, the paragraph states, in its entirety, that "[n]either Defendant Jamerson nor Defendant ACPD ever filed a police report or weapons report for the incident." Dkt. 26 ¶ 72. Not only does the statement not allege—or even imply—that the County swept the incident under the rug, but it also does not indicate that the County ratified—or even knew about—Defendant Jamerson's conduct. Such scant allegations cannot support a plausible *Monell* ratification claim. Moreover, Plaintiffs have failed to cite even a single case that supports the strange proposition that failure to file a police report itself constitutes ratification of police conduct.

In sum, even taking all Plaintiffs' allegations as true and drawing all reasonable inferences in their favor, Plaintiffs have failed to plausibly establish that "the[ir constitutional] deprivation occurred pursuant to a policy or custom adopted by the local governing body." *Monell*, 436 U.S. at 690. It follows that their *Monell* claim must be dismissed.

## CONCLUSION

For the above reasons, Defendants Albemarle County's motion to dismiss is hereby **GRANTED**. Dkts. 7, 17. Albemarle County is **DISMISSED** from this case.

It is so **ORDERED**.

11

The Clerk of Court is directed to send this Memorandum Opinion & Order to all counsel of record.

Entered this 12th day of June, 2024.

*[signature]*
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE