CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
June 14, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
     DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ALLEN SCHEFFER, *et al.*, | CASE NO. 3:23-cv-00048 |
| *Plaintiffs*, | |
| v. | MEMORANDUM OPINION AND ORDER |
| RANDY JAMERSON, | |
| *Defendant.* | JUDGE NORMAN K. MOON |

This case comes to the Court on Defendant Randy Jamerson's partial motion to dismiss for failure to state a claim. Plaintiffs Allen and Patricia Scheffer have brought multiple state and federal claims against Defendant. Relevant here, they assert claims for intentional infliction of emotional distress, gross negligence, and willful and wanton negligence. Defendant now seeks dismissal of these claims. For the following reasons, the Court will grant Defendant Jamerson's partial motion to dismiss.

### BACKGROUND[1]

In August of 2022, Plaintiffs Allen and Patricia Scheffer traveled to Charlottesville, Virginia to celebrate their 30th wedding anniversary. Dkt. 26 ¶ 10. Important here, during the trip, they rented a black jeep, *id.* ¶ 32, and stayed at a hotel in Charlotteville, *id.* ¶ 11.

While Plaintiffs were visiting Charlottesville, law enforcement was conducting a manhunt. In particular, the Albemarle County Police Department ("ACPD") asked the

---

[1] The following facts are taken from Plaintiffs' Second Amended Complaint. Dkt. 26. Although the Second Amended Complaint was filed after Defendant Jamerson's motion to dismiss, the parties agree that the Second Amended Complaint "does not moot Defendants' pending Motions to Dismiss." Dkt. 24 ¶ 7.

1

Charlottesville Police Department ("CPD") to help apprehend an individual who was believed to have abducted a woman in Florida. *Id.* ¶¶ 14, 17. ACPD informed CPD that they "had tracked the suspect's phone, and the phone was pinging" two cell towers in Charlottesville. *Id.* ¶¶ 15–16. ACPD provided CPD with a picture of the suspect, told CPD "the suspect's name, and advised that the suspect may be driving a black Jeep with tinted windows" and "some damage on the front of the vehicle." *Id.* ¶¶ 18, 21. Finally, ACPD instructed CPD to "alert ACPD if the vehicle was located, and not to approach the vehicle." *Id.* ¶ 20. ACPD's Special Weapons and Tactics Team ("SWAT") was placed on standby. *Id.*

During law enforcement's search for the suspect, a CPD officer reported that he had "found a black Jeep with Florida tags in the parking lot of" a hotel.[2] *Id.* ¶ 23. Notably, this Jeep was not an exact match to the suspect's vehicle. The Jeep *did not* "have tinted windows [or] damage to the front of the vehicle." *Id.* ¶ 24. Furthermore, when the officer "ran the Jeep's tag[,] he discovered that the car belonged to the Hertz rental car company." *Id.* ¶ 25.

Nevertheless, the CPD officer entered the hotel and showed a photograph of the suspect to the hotel clerk. Significantly, the "clerk stated that he believed he saw the suspect come in the hotel around midnight, just hours before, to check in." *Id.* ¶¶ 26–27. As a result, CPD "notified Defendant ACPD, and Defendant ACPD began activation of the SWAT team and Defendant Jamerson"—the "Special Operations Division Commander for the Albemarle County Police Department." *Id.* ¶¶ 3, 28.

Before the ACPD SWAT team arrived at the hotel, CPD attempted to "verify that the man the hotel clerk saw check in hours before was in fact the suspect." *Id.* ¶ 29. To do so, CPD asked the hotel clerk to locate the video of the supposed suspect checking in, and at the same

---

[2] Unbeknownst to the officer, the Jeep was Plaintiffs' rental car. *Id.* ¶ 32.

2

time, CPD contacted Hertz "to obtain information on the identity of the individual(s) who rented the Jeep." *Id.* ¶ 29. CPD's inquiries revealed that the suspect was likely not staying at the hotel. First, Hertz informed CPD that the Jeep "was rented out of Northern Virginia … to Mr. Scheffer." *Id.* ¶ 32. Then, shortly after, "the hotel clerk [ ] verified … that [Plaintiffs] checked into the hotel days prior." *Id.* ¶ 33. Further, law enforcement was eventually "able to view footage of the man the hotel clerk claimed he thought might be the suspect." *Id.* ¶ 40. And after viewing the footage, one officer apparently noted "that it was 'very obvious that the man in the video [—i.e., Mr. Scheffer—] was not the suspect.'" *Id.*

Nonetheless, "CPD officers, and ACPD officers, along with ACPD's SWAT team and Defendant Jamerson, still decided to go to [Plaintiffs'] room" to have "an allegedly consensual conversation with" Mr. Scheffer. *Id.* ¶¶ 38, 43. "All of these individuals began banging on Plaintiffs' door" in the middle of night. *Id.* ¶¶ 45–46. Startled awake by the banging, Mr. Scheffer initially ignored it, supposedly assuming that "the pounding of the door was a drunk guest who had the wrong room." *Id.* ¶¶ 47–48. However, when the banging continued, Mr. Scheffer walked to the hallway door of the hotel room "to investigate." *Id.* ¶¶ 49–52. He looked through the eyehole of the front door and saw a CPD officer on the other side. *Id.* ¶ 53. Wondering what was going on, Mr. Scheffer "identified himself through the door." *Id.* ¶¶ 56–57. He was then informed "that he 'was not in trouble,' but that they needed to talk to him about his vehicle outside." *Id.* ¶ 59. Assuming "that his rental vehicle must have been damaged in the parking lot, … he opened the door." *Id.* ¶ 61.

The scene that faced Mr. Scheffer was allegedly far from calm. Indeed, Mr. Scheffer supposedly saw "Defendant Jamerson's and [another officer's] gun[s] pointing directly at him[] within seconds of opening the door." *Id.* ¶ 62. Mr. Scheffer was instructed to "show his hands"

and then "ordered … to step outside." *Id.* ¶¶ 62–64. He complied. And "[a]s Mr. Scheffer approached, Defendant Jamerson grabbed Mr. Scheffer's left arm and led Mr. Scheffer to a wall in the hallway where he conducted a search of Mr. Scheffer and looked for weapons on Mr. Scheffer." *Id.* ¶ 66. At the same time, Defendant Jamerson and another officer purportedly retrieved "Mrs. Scheffer and … ordered [her] in[to] the hallway." *Id.* ¶ 68. During Plaintiffs' encounter with law enforcement, "Defendant ACPD's SWAT team w[as] stationed at the end of the hall on both sides at the stairwells." *Id.* ¶ 67. Moreover, Plaintiffs allege that, during the encounter, "Defendant Jamerson [and another officer] viewed portions of the inside of Plaintiffs' hotel room without consent … and also partially trespassed into their hotel room." *Id.* ¶ 68.

At the culmination of the incident, "Defendant Jamerson, and the remaining officers … confirmed … that Mr. Scheffer was not the suspect they were looking for, and released him and Mrs. Scheffer." *Id.* ¶ 70. Supposedly, "Defendant Jamerson later described the [interaction with] Plaintiffs as a 'wild goose chase.'" *Id.* ¶ 71. "Neither Defendant Jamerson nor Defendant ACPD ever filed a police report or weapons report for the incident." *Id.* ¶ 72.

## STANDARD OF REVIEW

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all its allegations taken as true and all reasonable inferences drawn in the plaintiff's favor. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation

to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (quotation marks omitted). This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics," instead the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (providing that "only a complaint that states a plausible claim for relief survives a motion to dismiss").

## ANALYSIS

In the present case, Defendant Jamerson takes issue with three of Plaintiffs' state law claims: (1) intentional infliction of emotional distress ("IIED") (Count III), (2) gross negligence (Count V), and (3) willful and wanton negligence (Count VI). He contends that Plaintiffs have "failed to state a claim" as to those counts and that, consequently, "those claims should be dismissed with prejudice." Dkt. 16 at 2. He is correct.

### I. *Plaintiffs have not plausibly alleged an IIED claim.*

While IIED claims are permitted in Virginia, *Womack v. Eldridge*, 210 S.E.2d 145, 148 (1974), they are, at the same time, "disfavored," *Michael v. Sentara Health Sys.*, 939 F. Supp. 1220, 1233 (E.D. Va. 1996) ("Because injury to the mind or emotions can be easily feigned, actions for intentional infliction of emotional distress are not favored in Virginia."); *Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 343 (Va. 2008) (recognizing that IIED claims are disfavored). IIED claims "require[] four elements to be proved: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection

between the wrongdoer's conduct and the emotional distress; and (4) *the emotional distress was severe.*" *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006) (emphasis added) (citing *Womack*, 210 S.E.2d at 148). Only the last element—i.e., whether Plaintiffs' emotional distress was severe—is at issue. Dkt. 16 at 5 n.2 ("For purposes of this Motion to Dismiss only, the first three elements of an IIED claim are not at issue.").

With respect to the severity element, liability "arises only when the emotional distress is extreme, and *only where the distress inflicted is so severe that no reasonable person could be expected to endure it*." *Russo v. White*, 400 S.E.2d 160, 163 (Va. 1991) (emphasis added). This is a high standard. It requires a plaintiff to allege that their "emotional distress reached such a level of severity that '[e]very aspect of [their] life [was] fundamentally and severely altered,' such that [they] 'had trouble even walking out of the front door.'" *Almy v. Grisham*, 639 S.E.2d 182, 188 (Va. 2007); *Pennell v. Vacation Reservation Ctr. LLC*, 783 F. Supp. 2d 819 (E.D. Va. 2011).

Without such serious, life-altering symptoms, a plaintiff cannot sustain an IIED claim in Virginia. Take *Harris v. Kreutzer*. There, a plaintiff alleged that she suffered from "nightmares, difficulty sleeping, extreme loss of self-esteem and depression, requiring … psychological treatment and counseling." *Harris*, 624 S.E.2d at 34. Despite these seemingly serious symptoms, the Supreme Court of Virginia dismissed her IIED claim, finding that she "failed to plead facts sufficient to support the severity element." *Id.* Likewise, in *Russo v. White*, the Supreme Court of Virginia "held that a plaintiff complaining of nervousness, sleep deprivation, stress and its physical symptoms, withdrawal from activities, and inability to concentrate at work failed to allege a type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it." *Id.* at 33 (citing *Russo*, 400 S.E.2d at 163). In short, without alleging life-altering consequences, a plaintiff cannot satisfy the severity element of an IIED claim.

And here, Plaintiffs' allegations fall far short of demonstrating life-altering consequences. Plaintiffs aver simply that "[t]he emotional distress and damages Plaintiffs suffered include but are not limited [sic] post-traumatic stress[,] … a loss of sleep and recurring night terrors." Dkt. 26 ¶ 73. That's it. This will not do. To be sure, these ailments are unpleasant, but they are not "of [such] severity that '[e]very aspect of [Plaintiffs'] li[v]e[s were] fundamentally and severely altered.'" *Almy*, 639 S.E.2d at 188. Indeed, Plaintiffs' injuries are both more conclusory and less extreme than those alleged in *Harris* and *Russo*—cases in which the Supreme Court of Virginia determined that plaintiffs "failed to plead facts sufficient to support the severity element." *Harris*, 624 S.E.2d at 34; *Russo*, 400 S.E.2d at 163. It follows that Plaintiffs have not sufficiently alleged severe emotional distress, and the Court will, thus, dismiss their IIED claim.

## II.   *Plaintiffs have also not stated a claim for gross or willful and wanton negligence.*

In Virginia, gross negligence is "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016). It "requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness." *Id.* Because the standard for gross negligence is "one of indifference, not inadequacy," "a claim of gross negligence must fail as a matter of law when the evidence shows that the *defendants exercised some degree of care*." *Id.* (emphasis added).

By contrast, "[w]illful or wanton negligence involves a greater degree of negligence than gross negligence," in that an essential ingredient of the act or omission is an "actual or constructive consciousness of the danger involved." *Boward v. Leftwich*, 89 S.E.2d 32, 35 (Va. 1955). Ordinarily, whether gross negligence has been established is a matter to be decided by the factfinder, though when reasonable minds could not differ upon the conclusion that such

7

negligence has not been shown, the Court should rule on the issue. *Frazier v. City of Norfolk*, 362 S.E.2d 688, 691 (Va. 1987).

Here, Plaintiffs allege that Defendant Jamerson committed "gross" and "willful and wanton negligence … when, among other things, [he] searched and seized Plaintiffs and pointed his weapon at [them] without any legal justification." Dkt. 26 ¶¶ 100, 105.

But even taking Plaintiffs' allegations as true, the allegations themselves demonstrate that Defendant Jamerson exercised *at least some care* in interacting with Plaintiffs. *Elliott*, 791 S.E.2d at 732. First, Defendant had a reason to "have an allegedly consensual conversation" with Mr. Scheffer to ensure that he was not the abduction suspect. Dkt. 26 ¶ 38. Specifically, Mr. Scheffer possessed several similarities to the suspect. Mr. Scheffer was renting "a black Jeep with Florida tags"—the same kind of vehicle as the suspect—and the suspect's phone was pinging in the area. *Id.* ¶¶ 15–16, 23. Moreover, the hotel clerk initially "stated that he believed he saw the suspect come into the hotel around midnight, just hours before, to check in." *Id.* ¶ 27. While it is true that law enforcement later received information which indicated that Mr. Scheffer "was 'probably not the suspect,'" *see id.* ¶¶ 32–37, they were only able to uncover this information through investigating the situation. *See id.* ¶¶ 32, 40. And the fact Defendant Jamerson investigated the situation at all—at a minimum—indicates that he took some care before confronting Plaintiffs. He did not, for instance, barge into Plaintiffs' hotel room and seize them immediately, without any regard for the circumstances of the situation.

Likewise, Defendant Jamerson exercised some care in the handling of his firearm. As Plaintiffs acknowledge, Defendant did not have his firearm drawn when Mr. Scheffer opened the door, nor did he fire haphazardly into the hotel room. *Compare id.* ¶ 62 *with Green v. Ingram*, 608 S.E.2d 917, 923 (Va. 2005). Rather, he waited to unholster his firearm. *See* Dkt. 26 ¶ 62

8

(noting that Defendant pulled his firearm "within seconds of [Mr. Scheffer] opening the door"). While Defendant's alleged actions might have been forceful or even aggressive, they are nonetheless illustrative of an individual who exercised at least "*some degree of care*" in handling his firearm. *Elliott*, 791 S.E.2d at 732.

At bottom, Plaintiffs' allegations, taken as true, do not indicate that Defendant acted with "complete neglect for [Plaintiffs'] safety, which is required to establish gross negligence. *Id.* at 733. Consequently, the Court will dismiss Plaintiffs' gross negligence claim. And because gross negligence requires a lesser showing than willful and wanton negligence, the Court's conclusion that Plaintiffs failed to state a claim for gross negligence similarly dooms their other claims of negligence.

In sum, the Court will grant Defendant Jamerson's partial motion to dismiss, and strike counts three, five, and six of the Second Amended Complaint.

## CONCLUSION

For the above reasons, Defendant Randy Jamerson's partial motion to dismiss is hereby **GRANTED**. Dkts. 4, 15. Counts three, five, and six of the Second Amended Complaint are hereby **DISMISSED**.

It is so **ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion & Order to all counsel of record.

Entered this 14th day of June, 2024.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE